RENDERED:  DECEMBER 22, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0421-MR

THOMAS GAINES, INDIVIDUALLY
AND DERIVATIVELY ON BEHALF
OF GAINES-GENTRY
THOROUGHBREDS, LLC                                        APPELLANT

 

|  | APPEAL FROM FAYETTE CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE THOMAS L. TRAVIS, JUDGE |
|  | ACTION NO. 18-CI-00091 |

 

HAL PRICE HEADLEY, III, AS
ADMINISTRATOR OF THE ESTATE
OF OLIN GENTRY                                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, COMBS, AND EASTON, JUDGES.

CETRULO, JUDGE:  Appellant Thomas Gaines ("Gaines") appeals three orders

dismissing all of his claims against his former business partner for alleged breaches

of contractual fiduciary duties and statutory obligations of good faith and fair

dealing.  Finding no error, we affirm the Fayette Circuit Court ("trial court").

# I. BACKGROUND

In 2018, Gaines filed a complaint against his co-manager, Olin Gentry ("Gentry"), at Gaines-Gentry Thoroughbreds, LLC[1] ("GGT"). The claims in the complaint span 17 years, during which the company went through multiple comprehensive changes in management. In his complaint, Gaines alleged Gentry[2] breached his statutory and contractual duties, committed fraud by omission, misappropriated GGT assets, and concealed "self-serving" transactions.

In 1994, Gaines's father first incorporated John R. Gaines Thoroughbreds, LLC to deal with a wide variety of equine-industry-related business interests. For purposes of our discussion, after Gaines's father left the company, it evolved into GGT with Gaines and Gentry serving as co-managers. Through the years, the parties signed various contractual agreements: (1) an employment agreement signed in 1997; (2) a succession agreement signed in 2000; (3) a settlement agreement signed in 2006; and (4) an operating agreement signed in 2007. The interpretation of those contracts forms the foundation of this action.

---

[1] Gaines Gentry Thoroughbreds, LLC, has evolved as a company through the years with various leadership, ownership, member composition, and structural formation. The company names have included Gaines-Gentry, LLC; Gaines-T-Breds, LLC; John R. Gaines Thoroughbred, LLC; and Gaines-Gentry Thoroughbreds, LLC, but for clarity we shall use "GGT" throughout, unless distinction is necessary.

[2] Shortly after the filing, Gentry passed away and Gaines continued the action against his estate, represented by Hal Price Headley, III, as administrator of Gentry's estate.

In 1997, Gentry signed an Employment Agreement ("1997 Employment Agreement") with GGT.[3] The 1997 Employment Agreement imposed upon Gentry fiduciary and reporting obligations. In relevant part, the contract stated:

> During the Term, [Gentry] shall not engage in any activity which is (or has the potential to be) in conflict with the interests of [GGT] or [GGT's] Affiliates or which is otherwise inconsistent with the highest fiduciary standards and duties (including, but not limited to, the fiduciary duty of loyalty generally imposed upon employees, officers, and directors of business corporations). In this regard, *but not by way of limitation* of [Gentry's] general fiduciary duties, [Gentry] shall not engage in any paid or unpaid work activities which are not for the benefit of [GGT]. . . . [Gentry] shall not engage in, invest in, purchase, acquire, trade, exchange, sell, syndicate, breed or otherwise possess, receive, or otherwise deal in or with respect to any equity, creditor, profit, cash flow, distribution, compensatory, or other interests in or with respect to any equine interests, participations, investments, shares, fractional interests, foal sharings, breeding rights, commissions or other rights or benefits, whether direct or indirect through any one or more corporations, partnerships, limited liability companies, trusts, or other entities, individuals (whether or not related), third party arrangements, or otherwise, except [those equine interests approved by the Board and/or currently owned and reported]. . . . Furthermore, [Gentry] shall be obligated to immediately present to [GGT], and permit [GGT] to take, separately or with other, any and all rights, options, or other business or investment opportunities with respect to equine interests and activities of which [Gentry] has knowledge or which are presented to or otherwise come to [Gentry's] attention at any time during the Term.

---

[3] More specifically, with John R. Gaines Thoroughbreds, LLC.

-3-

During the relevant timeframe – although the exact dates are unclear from the record – Gentry solely owned Geneli Thoroughbreds, Inc. ("Geneli"). The record reflects that Gaines was aware – he claimed "vaguely aware" – of Gentry's ownership of Geneli, and Gaines admitted he had received commission checks from Geneli.

In 2000, as a condition of becoming President and CEO of GGT, Gentry signed a Succession Agreement ("2000 Succession Agreement") which passed control of GGT to Gaines and Gentry from Gaines's father. The 2000 Succession Agreement created a management board made up of Gentry, Gaines, and Gloria (Gaines's sister), and it repeated (as similarly detailed in the 1997 Employment Agreement), that the three board members must present any business opportunities which become available to them by reason of their relationship with the company to the other principals.

> All potential equine transactions and equine-industry-related investment or business opportunities which are developed by, or become available to, [Gentry], Gloria or [Gaines], and any other potential investment or business opportunities which become available to [Gentry], Gloria or [Gaines], directly or indirectly by reason of his or her relationship with [GGT] and its activities, shall be presented to [GGT] and the other [members], and [GGT] or all three of [Gentry], Gloria or [Gaines], as the cause may be, shall have the right and privilege to elect to take and pursue such transaction or opportunity, with all economic benefits therefrom inuring to the benefit of [GGT] . . . . None of [Gentry], Gloria or [Gaines], will be

permitted to individually invest or pursue equine transactions or equine-industry-related investment or business opportunities if [GGT] or the other two [members] refuse or fail to take or pursue such transaction or opportunity, unless agreed to by all three of them.

However, Gaines, Gentry, and Gloria were unable to manage GGT as a cohesive unit, and in 2003 Gaines filed a lawsuit against Gloria seeking to remove her from GGT. In 2006, Gaines and Gloria reached a settlement ("2006 Settlement Agreement") that removed Gloria from the company but was silent as to any management issues.

In 2007, Gaines, Gentry, and Gaines's mother, Joan Gaines ("Joan"), signed a Second Amended Operating Agreement that was backdated to January 2006 ("2006 Operating Agreement"). While both Gaines and Gentry were designated as "Managers," Gentry handled the active management of GGT as operating manager. The 2006 Operating Agreement did not contain language requiring the members to share equine interests with each other or GGT. In fact, the 2006 Operating Agreement waived many fiduciary duties and superseded prior contracts.

> 5.7 Fiduciary Duties of Members. To the fullest extent permitted by Law, each Member (the "Waiving Member") hereby agrees to (a) waive any fiduciary duties or personal liability that any other Member may have to the Company or such Waiving Member, whether such duties or liability would otherwise arise in such other Member's capacity as a Member, Manager or officer, and (b) eliminate any

personal liability any other Member may have to the Company or such Waiving Member.

. . .

19.6 <u>Entire Agreements</u>. This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous oral or written agreement or understanding among the parties hereto with respect to the subject matter hereof.

In his appellant brief, Gaines argues that before filing this complaint, he requested and received a copy of the 2006 Operating Agreement from GGT's legal counsel, Frost Brown Todd, LLC. The copy he received was missing pages nine and 11; the above fiduciary language of Section 5.7 was on page nine. Other fully executed copies of this 2006 Operating Agreement – possessed by Gentry and other GGT business associates[4] – contained all the pages.

In 2014,[5] Gaines gained access to GGT's storage unit and sought to inventory GGT records in order to prepare for unrelated litigation. As Gaines

---

[4] In his appellant brief, Gaines states that he "asked [GGT's] counsel, Frost Brown Todd, LLC, for a copy of the [2006 Operating Agreement]." However, in his appellee brief, Gentry points out that Gaines received his copy of this contract from his mother's trust attorney, *not* GGT's corporate attorney; both the trust attorney and corporate attorney were members of Frost Brown Todd, LLC, but were not the same individual. Additionally, Gentry states that complete copies of the contract, without any missing pages, were available to Gaines upon request from the GGT office manager, GGT's corporate legal counsel, GGT's corporate accountant, and/or located in the GGT storage facility and Gaines's email.

[5] Gaines cites 2014, 2015, and 2016 throughout this litigation, but for clarity we shall use 2014 consistently. The record suggests Gaines first attained access to the GGT storage unit in 2014, began organizing in 2015, and found records of various concerning transactions through 2016.

-6-

organized the documents in the storage unit, he discovered multiple payments to Gentry (and/or Gentry's company, Geneli) that he claimed were proof of Gentry's "self-dealing transactions." Gentry kept records from his personal company, Geneli, on the GGT computer system, and apparently in the GGT storage unit. Although not explicitly stated in the appellate briefs, it appears that Gaines received access to both GGT and Geneli records at that time. This litigation resulted from Gaines's review of those records.

In January 2018, Gaines filed suit against Gentry alleging nine improper transactions, requesting both compensatory and punitive damages. The trial court dismissed all nine transactions through three separate orders: a 2019 order granting summary judgment, in part ("2019 Summary Judgment"); a 2022 order granting summary judgment, in part ("2022 Summary Judgment"); and a 2023 order entered after a bench trial ("2023 Order"). Gaines appeals all three orders.

## II.  ANALYSIS

On appeal, Gaines argues the trial court erred in dismissing four of the nine alleged improper transactions.[6] Gaines argues these transactions were "self-

_____

[6] Gaines also listed a fifth improper transaction for appellate review as "[n]umerous payments made to Gentry's sister, Kathleen [a GGT employee from 2001-2007], labeled 'bonus.'" Gaines *implies* the bonus checks were inappropriate but ends his argument there, as he also did before the circuit court. The circuit court, in the 2022 Summary Judgment, stated that "[Gentry] [did] not assert how these checks [to Kathleen] were wrongful besides the fact that they were written." On appeal, Gaines does not – in any way – show how the bonus checks to Kathleen were a "self-

dealing" payments by Gentry and a breach of his fiduciary duties, and/or breaches of implied covenants of good faith and fair dealing. Conversely, Gentry asserts that Gaines's legal approach in this litigation was to find payments to Gentry (or Geneli) in the GGT records, claim – without supporting evidence – that the payments *alone* proved impropriety, and then attempt to shift the burden to Gentry to prove the transactions were legitimate.[7] Gentry asserts that all the transactions were properly recorded in the GGT records; all parties had equal access to the GGT records; and Gaines chose not to review the records until 2014 then assumed, without proof, that payments to Gentry and/or Geneli were improper. We shall address each transaction in turn.

A. **Two September 2007 Payments: Commission from Winstar Farm and Thoroughbred Crystal Current Interest**

The 2019 Summary Judgment dismissed these claims.

In February 2018, Gentry filed a motion to dismiss for failure to state a claim, but the court considered matters outside the pleadings, thereby treating the

---

dealing" transaction by Gentry. The mere existence of bonus checks paid to an employee does not create a standalone argument of impropriety. In fact, Gaines does not discuss – in either his appellant or reply brief – *how* the trial court erred by dismissing these bonus-check-inferences and, therefore, neither shall we.

[7] The trial court appears to share this impression. In the third order in this appeal, the 2023 Order, the trial court stated, "It was apparent from [Gaines's] testimony that many of the claims he has raised in this action were based simply on finding evidence of any payment to Gentry and asserting that such payments were wrongful."

motion as one for summary judgment. The appellate standard of review when a trial court has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rule of Civil Procedure ("CR") 56.03. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991) (citation omitted). As "[a]ppellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists[,]" our review is *de novo*. *Shelton v. Ky. Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (citation omitted).

Gaines states in his appellate brief:

In 2007, [GGT] was involved in negotiating the purchase of numerous syndicated stallion shares from various farms for a stallion share venture. Shares were acquired from Winstar in the Fall of 2007. In September 2007, Gentry received a check payable to him, individually, from Winstar in the amount of $150,000. The check was deposited into Geneli's account, and referenced in Geneli's records as "miscellaneous." Gaines was not aware of this payment until the check and related documents were discovered by him in [GGT's] records in [2014]. ["Winstar Commission"]

. . .

On September 30, 2007, Gentry wrote a check on his Geneli account for $75,000, completed the date, amount

-9-

and signature in blue ink. In black ink, "Hill 'n' Dale Farms" was printed as payee, and "CRYSTAL CURRENT" was printed on the "For" line. CRYSTAL CURRENT was sold less than a year later at auction for $3,000,000.00. Gaines's Verified Complaint alleged his belief that the September 30, 2007, check was used by Gentry to acquire an ownership interest in CRYSTAL CURRENT from Hill 'n' Dale Farm. This business opportunity belonged solely to [GGT]." ["Crystal Current Interest"]

Gaines argues that Gentry's failure to adequately report and/or share the Winstar Commission and Crystal Current Interest with GGT and the other principals were improper acts of "self-dealing." However, the trial court disagreed, finding that the *complete* version of the 2006 Operating Agreement was controlling; Paragraph 5.7 of that contract waived fiduciary duties; Gentry did not act beyond the scope of the controlling contract, and therefore Gentry was entitled to summary judgment on those claims.

On appeal, Gaines argues that the 1997 Employment Agreement and the 2000 Succession Agreement were still binding in 2007 and required Gentry to present any business opportunities (which become available to him by reason of his relationship with the company) to the other principals. Further, he asserts that *his copy* of the 2006 Operating Agreement – *missing* Paragraph 5.7 that waived fiduciary duties – should be controlling, at least for purposes of averting summary judgment. Conversely, Gentry argues that the trial court was correct to find his version of the 2006 Operating Agreement – *containing* Paragraph 5.7 – was

-10-

controlling.  Gentry argues that because Paragraph 5.7 waived fiduciary and reporting duties, Gentry did not act improperly by accepting the Winstar Commission nor the Crystal Current Interest.

First, we must consider the pertinent factual findings of the trial court. "Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  CR 52.01.  Findings are not clearly erroneous if they are supported by substantial evidence.  *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citation omitted).

The 2019 Summary Judgment stated, "Gaines' assertion that these [fiduciary and statutory duties of loyalty] were not waived because the version provided to him by the company's counsel did not contain the relevant page is without merit."  In essence, the trial court made the factual finding that the version of the 2006 Operating Agreement – *with all the pages included* – is the authentic, controlling document.

> The Court notes that, if page 11, which contains Paragraph 5.7, were removed from the contract, the language and ordering of the provisions would be nonsensical.  First, the pages are numbered, so it would be immediately apparent to a reasonable person, particularly an experienced businessman such as Gaines, that there are contractual provisions missing.  Further, at the bottom of page 10 is Paragraph 5.4, and at the top of page 12 is Paragraph 8.3. Even assuming that page 11 of Gaines' contract were missing, no reasonable person would conclude that the

contract was intentionally drafted that way or that the provisions on the missing page somehow would be inapplicable or irrelevant. Thus, in the Court's view, there is only one reasonable conclusion that can be reached: that the version of the [2006 Operating Agreement] as tendered by Gentry [with all the pages included] is the authentic and controlling document, and Gaines' assertion to the contrary cannot stand. The fiduciary duty of loyalty is waived in that [2006 Operating Agreement.]

On appeal, Gaines argues that due to the standard of review on summary judgment – viewing the record in a light most favorable to the party opposing the motion for summary judgment and all doubts being resolved in his favor, *Steelvest*, 807 S.W.2d at 480 (citation omitted) – the trial court erred by not accepting his version of the 2006 Operating Agreement as controlling. However, we do not agree. The standard of review described in *Steelvest* does not remove the trial court's ability to make a factual finding when only one reasonable conclusion exists. "If reasonable minds cannot differ or . . . when only one reasonable conclusion can be reached, the litigation may still be terminated." *Dishman v. C & R Asphalt, LLC*, 460 S.W.3d 341, 347-48 (Ky. App. 2014) (quoting *Shelton*, 413 S.W.3d at 916). Moreover, the summary judgment standard is to be applied in a practical sense, not absolute.

> Summary judgment is appropriate when "'as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant.'" [*Steelvest*, 807 S.W.2d at 483)] (quoting *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)). In using the word

> "impossible" in *Steelvest*, we have acknowledged that it
> "is used in a practical sense, not in an absolute sense."
> *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992).

*O'Bryan v. Cave*, 202 S.W.3d 585, 587 (Ky. 2006).

As such, the summary judgment standard of review does not mandate that Gaines's version of the 2006 Operating Agreement be accepted as controlling, when to do so – as determined by the trial court – is unreasonable. *Dishman*, 460 S.W.3d at 347-48. The trial court's factual finding – that the complete version of the 2006 Operating Agreement, including Paragraph 5.7, was the proper, legal version of the contract – was based on substantial evidence and therefore was not clearly erroneous. As such, we are bound by that finding. However, Gaines argues – even accepting that factual finding – Gentry still acted improperly based on other contractual[8] and statutory grounds.

Gaines argues Paragraph 5.7 did not supersede or rescind the fiduciary duties imposed on Gentry in the 1997 Employment Agreement and 2000 Succession Agreement because the boilerplate integration provision in the 2006

---

[8] In part, Gaines argues Paragraph 5.7 is ambiguous because it is inconsistent with Paragraph 14.3 and 18.2 of the same document. The 2019 Summary Judgment did not discuss this issue factually or legally. The court speaks through its orders, *see Kindred Nursing Centers Limited Partnership v. Sloan*, 329 S.W.3d 347, 349 (Ky. App. 2010), and our appellate review is limited to those matters which were addressed by the lower trial, *Fischer v. Fischer*, 197 S.W.3d 98, 102 (Ky. 2006) (citing *Combs v. Knott County Fiscal Court*, 141 S.W.2d 859, 860 (Ky. 1940)). If Gaines wished additional findings as to ambiguity or inconsistency, he was required to motion for additional findings before the trial court. *See Eiland v. Ferrell*, 937 S.W.2d 713, 716 (Ky. 1997) (citing CR 52.04). Therefore, we need not analyze this ambiguity argument regarding Paragraph 14.3 and 18.2.

Operating Agreement only supersedes those agreements "with respect to the [same] subject matter." Gaines argues that since the 2006 Operating Agreement deals with different subject matters than the 1997 Employment Agreement and 2000 Succession Agreement, those prior contracts were still binding at the time Gentry received the Winstar Commission and Crystal Current Interest. Yet, we find this argument to be without merit.

As stated, we are bound by the finding that the *complete* 2006 Operation Agreement is the applicable version of the contract; therefore, we include Paragraph 5.7 in our analysis. Paragraph 5.7 clearly, explicitly waives fiduciary duties. "Where the contract's language is clear and unambiguous, the agreement is to be given effect according to its terms, and 'a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.'" *Vorherr v. Coldiron*, 525 S.W.3d 532, 543 (Ky. App. 2017) (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)).

Here, Paragraph 5.7 of the controlling 2006 Operating Agreement "waive[d] any fiduciary duties or personal liability that any other Member may have to [GGT.]" Prior contracts created fiduciary duties among the parties; the controlling 2006 Operation Agreement eliminated those duties; thus, the subject matters are overlapping *as to fiduciary duties*. Just because the 1997 Employment Agreement, 2000 Succession Agreement, and 2006 Operating Agreement might

not overlap 100% on other subject matter, does not somehow create *an assumption* that these contracts are unenforceable or inconsistent as a whole. The Paragraph 5.7 waiver language is clear, concise, and controlling on the fiduciary subject.

We additionally note, the 2006 Operating Agreement supersedes prior contracts because the plain language of the contract clearly states such an intent.

> 19.6 <u>Entire Agreements</u>. This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any prior or contemporaneous oral or written agreement or understanding among the parties hereto with respect to the subject matter hereof.

Again, when a contract is clear, we are bound to interpret the contract using its ordinary meaning. *Id.*

Next, Gaines argues the 2006 Operating Agreement is invalid because it was induced by fraudulent omission. Gaines asserts he "did not and could not learn of [the Winstar Commission and Crystal Current Interest] transactions until December [2014], when he began to review [GGT] documents previously kept in the storage unit." Gaines argues Gentry had a duty to disclose these "prior instances of self-dealing to Gentry" before signing the 2006 Operating Agreement, and because Gentry did not properly and adequately disclose those dealings, the 2006 Operating Agreement is not valid. However, he leaves this argument unsupported.

In order for a plaintiff to succeed on a claim of fraudulent omission, he must prove "a) that the defendants had a duty to disclose [a material] fact; b) that defendants failed to disclose that fact; c) that the defendants' failure to disclose the material fact induced the plaintiff to act; and d) that the plaintiff suffered actual damages." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003) (citing *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127 (Ky. App. 1998)). According to Gaines, both the Winstar Commission and Crystal Current Interest transactions occurred in *September 2007*. Although the 2006 Operating Agreement was backdated to January 2006, it was signed by the parties in *October 2007*. Even if – assuming for purposes of this limited discussion – Gentry had a duty to disclose, Gaines does not show, in any way, how Gentry "failed to disclose" the Winstar Commission and Crystal Current Interest. He does not explain how Gentry recording the transactions in the Geneli and/or GGT books was not "disclosure." Gaines admits that his review of the GGT records revealed these payments; it is unclear why he "could not learn" about the transactions until December 2014.

Simply, Gaines, as a manager, had access to the GGT records at all times,[9] and when he finally looked at the books, he saw the transactions.

---

[9] Gaines asserts that he did not have a key to the GGT storage unit, but rather, had to convince an employee of the storage facility to allow him access. However, he does not argue that he requested access and/or a key but was denied by Gentry or any other employee of GGT.

Moreover, it is unclear why Gaines did not check the company books prior to signing a new operating agreement. Gaines does not explain how Gentry's alleged failure to disclose the transactions induced him to act. If the new operating agreement was signing away fiduciary duties, it is unclear how business transactions – occurring almost simultaneously in time to the contract signing – would convince Gaines not to sign a contract that did away with fiduciary duties. Asked another way, if he was signing away fiduciary duties in October 2007, would transactions occurring (possibly without recognition of fiduciary duties) in September 2007, have swayed him from signing? Gaines fails to address these elements or concerns on appeal. In short, Gaines fails to establish fraud by omission.

Next, Gaines argues Gentry breached his statutory[10] good faith and fair dealing obligations by usurping GGT's business opportunities. Although our review is *de novo*, the trial court's conclusions concisely addressed the matter.

> "In every contract, there is an implied covenant of good faith and fair dealing." [*Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 241 (Ky. 2013) (quoting *Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)).] This is a "separate concept" to that of a fiduciary duty; the covenant "merely requires the

---

[10] Kentucky Revised Statute ("KRS") 275.003(7) states, "[e]ach member and manager and any other party to an operating agreement shall discharge all duties and exercise all rights consistently with the obligation of good faith and fair dealing. The obligation of good faith and fair dealing may not be eliminated in the operating agreement, but it may prescribe the standards by which the performance of the obligation is to be measured provided the standards are not manifestly unreasonable."

parties to 'deal fairly' with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty." [*Id*. at 241-42 (quoting *In re Sallee*, 286 F.2d 878, 891-92 (6th Cir. 2002))].

Gaines alleges that Gentry engaged in self-dealing and/or other business ventures in violation of the terms of the [2006 Operating Agreement] that harmed both him and GGT. However, since the fiduciary duty of loyalty was waived in that Agreement, Gentry was not required to "place the interest of [Gaines] before his own," and there [were] no allegations that Gentry otherwise failed to "deal fairly" with Gaines. In the Court's view, Gaines'[s] claims that Gentry took GGT opportunities for himself and derived benefits therefrom are not applicable under the implied covenant of good faith and fair dealing.

Gaines argues that "subterfuge and evasions" act as a breach of the statutory requirement of good faith and fair dealing, but he does not then point to any acts of "subterfuge" or "evasion" by Gentry. In fact, the trial court specifically stated that there were "no allegations that Gentry otherwise failed to 'deal fairly' with Gaines." On appeal, Gaines alleges that Gentry "concealed" the Winstar Commission and/or the Crystal Current Interest transactions, but as already discussed, it is unclear how (or if) Gentry "concealed" the transactions. Gentry recorded the transactions and placed record of the transactions in the company books. Gaines does not contest those facts. In short, Gaines does not support this argument and we are not at liberty, nor of the inclination, to create an argument where none exists.

Lastly, Gaines argues Paragraph 5.7 did not bar equitable remedies requested by Gaines. Gaines argues he was due the equitable remedy of disgorgement for "amounts received by Gentry from [GGT] while he was breaching his contractual and fiduciary duties to [GGT], and of proceeds Gentry received through any entity or partnership (including Geneli) in any way related to the equine industry." However, Gaines does not support these overarching requests; he argues that such remedies are not legally barred, but he does not support the argument that such remedies are appropriate. Fundamentally, Gaines seeks equitable relief for breaches of duty, yet he proved no such breach; accordingly, we need not discuss the requested relief.

Therefore, Gentry was entitled to summary judgment on both the Winstar Commission and Crystal Current Interest transaction claims.

**B.    2001 Consulting Payment**

The 2022 Summary Judgment dismissed this claim.

Again, the appellate standard of review when a trial court has granted a motion for summary judgment is whether there is "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The record must be viewed in a light most favorable to Gaines, *see Steelvest*, 807 S.W.2d at 480 (citation omitted), and our review is *de novo*, *Shelton*, 413 S.W.3d at 905 (citation omitted).

Gaines argues that Gentry's failure to report and/or share a March 2001 Consulting Payment with GGT and the other principals was another improper act of "self-dealing."[11] Gaines states in his appellate brief:

> A $150,000 handwritten check was written from [GGT's] account to Gentry's wholly-owned company, Geneli. The check was signed by Gentry and stamped with a signature stamp for Gaines's signature that was kept in [GGT's] office and under Gentry's control. A Geneli deposit slip was created with "Consulting G-G" handwritten on the slip. The check was then deposited into Geneli's bank account. [GGT] did not owe this money to Geneli or to Gentry, and Gaines was unaware of this payment until he discovered the relevant documents in [GGT's] records in [2014]. ["Consulting Payment"]

KRS 413.090(2) limits breach of contract claims to a 15-year statute of limitations. This action was filed in 2018, 17 years after Gentry received and recorded the payment in the GGT books. KRS 413.190(2) allows limitations to be tolled if the defendant "obstructs the prosecution of the action[.]" However, the

---

[11] Gaines's appellant brief states no discovery took place on the Winstar Commission and Crystal Current Interest transactions ("[N]o discovery ever took place on Gentry's secret commission from WINSTAR or the secret interest in CRYSTAL CURRENT"), but that discovery *did* occur for the Consulting Payment and Marino Marini Commission ("Following discovery, both parties moved for summary judgment."). And yet, in his reply brief, Gaines seems to argue that he was not allowed sufficient time for discovery. "The Circuit Court dismissed the bulk of Gaines's claims before any discovery could be conducted. Gaines did not have the opportunity to identify material issues of fact as to those claims, or as to the applicability of KRS 413.190(2) to them." However, it is unclear what/which of the transaction(s) on appeal he is referring to in his reply brief. It appears – due to his reference to the statute of limitations – that he is referring to the Consulting Payment in his reply brief, but that would be inconsistent with his appellant brief that both parties moved for summary judgment *after discovery* was conducted. Also, Gaines does not state that he moved for additional time for discovery before the trial court. As a result, discovery, or the lack thereof, was not effectively argued before this Court and will not be addressed further.

limitations period *begins* when a plaintiff "should have discovered his cause of action by reasonable diligence." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575 (Ky. 2009) (citation omitted).

Gaines argues the trial court erred because, "[a]lthough the concealment contemplated by the statute [KRS 413.190(2)] usually constitutes some 'affirmative act,' an important exception to that requirement exists where a party remains silent when the duty to speak or disclose is imposed by law upon that person[,]" citing *Emberton*, 299 S.W.3d at 573. However, accepting that supposition as true, Gaines does not show how Gentry failed in his duty to speak or disclose the Consulting Payment. Gaines does not show that Gentry "remained silent"; to the contrary, his actions spoke volumes. The Consulting Payment was recorded in multiple places in GGT's general ledger as payment for consulting fees to Geneli, a business which was known to Gaines and from which Gaines had received commission checks. Gaines does not show how "reasonable diligence" could not have discovered the transaction in 2001.

During his deposition, GGT accountant Louis Fister ("Fister") stated that the 2001 GGT general ledger contained check 7863 paid to Geneli and recorded as a consulting payment. Fister also identified the Consulting Payment on an audited financial statement his company prepared for GGT. Fister testified that the related party payable identified on the financial statement was the same

-21-

transaction identified in the general ledger.  In his deposition, Gaines concedes that the 2001 audited financial statements, which were prepared primarily for his benefit, showed the Consulting Payment.

Nevertheless, Gaines argues that the statute of limitations was tolled by Gentry's "concealment" of the Consulting Payment.  The trial court disagreed, finding "no evidence of concealment":

> The record shows that the payment was duly documented in the general ledger, and [GGT's] record keeper knew of the transaction and recorded it.  Therefore, there is no evidence of concealment of this payment.  The Court finds the tolling argument put forth by [Gaines] invalid because [Gaines] had full access to the books, records, and accounts and did a full financial audit of the company in 2007, where he had unrestricted access to all relevant financial information.  Any impropriety could have been discovered during that financial audit.  Further, Gentry met his duty of disclosure by accurately reporting each of the transactions and ensuring they were logged.

Here, the trial court concluded that, assuming he had a duty to disclose, Gentry accurately documented the payment and included it in the financial statements – prepared for Gaines – for 2001.  The trial court's factual finding of no concealment was not clear error as it was supported by substantial evidence.  Additionally, Gaines does not substantiate his claim that Gentry's actions, or inaction, tolled the statute of limitations applicable here.  As such, this claim is barred by the statute of limitations and was properly dismissed by the trial court.

## C. 2003 Commission Payment from Sale of Marino Marini

After a bench trial, the 2023 Order dismissed this claim.

Similarly, to our standard of review above, our appellate review on this issue follows CR 52.01 for factual findings and *de novo* for legal arguments.

> Under CR 52.01, the trial court is required to make specific findings of fact and state separately its conclusions of law relied upon to render the court's judgment. Further, those findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. CR 52.01. In fact, judging the credibility of witnesses and weighing evidence are tasks within the exclusive province *of the trial court*.
>
> If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion. However, while deferential to the lower court's factual findings, appellate review of legal determinations and conclusions from a bench trial is *de novo*.

*Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016) (internal quotation marks and citations omitted).

Gaines states in his appellant brief:

> In July 2003, Gentry became involved in the sale of MARINO MARINI by an agent in Ireland to a California farm for $1,000,000. In August 2003, Gentry received a check for $50,000, drawn on an Irish bank, payable to him personally. [O]n September 16, 2003, he completed a Geneli deposit slip and wrote "Marino Marini Commission," then deposited it into Geneli's account.

-23-

Gaines was not aware of this payment until the check and related documents were discovered by him in [2014]. ["Marino Marini Commission"]

Gaines argues that Gentry's failure to report and/or share his Marino Marini Commission with GGT and the other principals was a fourth improper act of "self-dealing." Unlike the other alleged "improper" transactions, this took place – in August 2003 – *before* fiduciary duties were waived in the 2006 Operation Agreement, and *within* the judiciable window (*i.e.*, less than the applicable 15-years required to initiate the statute of limitations). Also, unlike the other claims, the trial court did not dismiss this transaction controversy through summary judgment.

Instead, in January 2023 the trial court held a bench trial. Shortly thereafter, the court entered its 2023 Order dismissing Gaines's fourth and final claim. Key to this dismissal is the trial court's fact-finding and again, Gaines's failure to support his claim. The court stated,

> At the bench trial, [Gaines] introduced exhibits documenting the MARINO MARINI sale and the commission payment of $50,000 to Geneli and testified on direct that he did not receive any commission payment from the sale of MARINO MARINI. However, on cross-examination and consistent with [] Gaines's deposition on September 22, 2021, he testified that he simply "did not recall" whether he received compensation for the sale of MARINO MARINI. Furthermore, in a separate lawsuit in 2015, [] Gaines likewise testified that he did not recall whether he received a commission payment for the sale of MARINO MARINI.

[Gaines] offered no other affirmative evidence or testimony at the trial of this matter to prove that, nearly 20 years ago, GGT or its members did not receive the commission payment from [] Gentry for the [Marino Marini Commission].

It was apparent from [Gaines's] testimony that many of the claims he has raised in this action were based simply on finding evidence of any payment to Gentry and asserting that such payments were wrongful. An example is the $50,000 payment to a trust for the benefit of Gentry, which [Gaines] avowed was not owed to Gentry and was misappropriated. As testified by Mr. Fister and reflected on [Gentry's] exhibit 1, the payment was a profit distribution from [GGT] and identical checks were written to the other members, including [] Gaines, on the same date. When shown the distribution check payable to him, Gaines conceded his error and testified that he "was not aware he received the check." Yes he had received it, and a simple investigation of the company's records or a brief consultation [with] the company's CPA could have confirmed that.

Immediately after this testimony, [] Gaines conceded that this same failure to recall receiving a check was the basis for his claim regarding MARINO MARINI. [Gentry] presented testimony by Louis Fister, CPA, an accountant who had performed services for both GGT and Geneli and who authenticated records from 2004 to 2005 indicating payments for commission and other equine-related services from Geneli to [] Gaines. Fister testified that he did not provide accounting services to Geneli in 2003 and did not have documents or knowledge proving or disproving the payment of a commission-related MARINO MARINI to [Gaines].

Again, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. "In fact, judging the

-25-

credibility of witnesses and weighing evidence are tasks within the exclusive province *of the trial court*." *Barber*, 505 S.W.3d at 754.

Gaines did not provide any accounting records for 2003, the year of the Marino Marini Commission, nor did he present any evidence to establish payment or the absence thereof. After making similar accusations that proved to be *inaccurate guesses*, it was reasonable for the court to (1) make note of an absence of accounting evidence and (2) call into question Gaines's testimonial credibility. The trial court's factual findings were deliberate and well-reasoned. Based on Gaines's own admissions on the stand and failure to produce any other witness or evidence supporting his allegation, there is no basis to conclude that the trial court's findings of fact are clearly erroneous, and therefore we accept these facts.

Under Kentucky law, to prevail on a breach of contract claim, Gaines needed to prove "(1) the existence of a contract; (2) breach of the contract; and (3) damages flowing from the breach of contract." *See Brown & Brown of Ky., Inc. v. Walker*, 652 S.W.3d 624, 631 (Ky. App. 2022) (citation omitted). Here, element one was met; element two was *not* met; and, subsequently, element three need not be discussed.

The parties agree that the 2000 Succession Agreement – with its duty to report and share equine business opportunities with each other – was

contractually binding in 2003, but Gaines was unable to establish breach of the 2000 Succession Agreement. Essentially, Gaines did not show he was not paid. Gaines attempts to shift the burden to Gentry to prove Gentry shared the Marino Marini Commission,[12] but such a burden shift is not consistent with Kentucky law. CR 43.01 requires "[t]he party holding the affirmative of an issue must produce the evidence to prove it." *See CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 73 (Ky. 2010) (stating the party bringing the breach of contract claim bears the burden of proving the elements) and *Morrison v. Trailmobile Trailers, Inc.*, 526 S.W.2d 822, 824 (Ky. 1975) ("CR 43.01 place[s] the burden and risk of non-persuasion on the appellant as to the issues upon which the trial court made findings.").

While we owe no deference to the trial court's legal conclusions in this *de novo* review, we appreciate the trial court's clarity in explaining the issue.

> Kentucky Courts have recognized the rule of equal probabilities. [*Texaco, Inc. v. Standard*, 536 S.W.2d 136, 138 (Ky. 1975).] Further, the kind of speculation that is not allowable occurs when the probabilities of an event's having happened in one or two or more ways are equal,

---

[12] The trial court stated that "[Gaines] offered no accounting records of either his own or GGT in support of this [Marino Marini Commission] claim." On appeal, Gaines seems to argue in his reply brief that his exhibits during the bench trial were such accounting records, but they are not. These exhibits are examples of individual transactions (that were reported around the time of the Marino Marini Commission receipt) and fall quite short of a full accounting for the time frame in question. Exhibit 1 is illegible. Exhibit 2 was a bill of sale for Marino Marini signed *only* by the "purchaser," Rancho San Miguel (*not signed by Gentry*). Exhibit 3 is a copy of a check to Randy Gullatt for $50,000 on August 1, 2003. Exhibit 4 is a copy of a check to Gentry for $50,000 on August 1, 2003. Exhibit 5 is a Geneli bank statement dated September 13, 2003, to October 15, 2003, showing a deposit of $50,000 on September 16 and a wire transfer credit of $100,000 on October 3.

and there is no evidence as to which way it happened." [*Schuster v. Steedley*, 406 S.W.2d 387, 390 (Ky. 1966) . . . .] This is how the Court views this case and the issue subject to the bench trial. Mr. Gaines' claim could be or might be true, i.e., that he did not receive his share of the commission. The opposite is equally true. The evidence presented by Gaines at trial does not compel a conclusion that more likely than not, he did not get his share of the commission.

Gaines failed to show that Gentry breached the terms of the 2000 Succession Agreement by not bringing the Marino Marini opportunity to GGT or providing GGT (or Gaines) with a share of the commission. As such, he did not establish an essential element of his claim, and therefore, the trial court properly dismissed the claim.

### III. CONCLUSION

The trial court did not err when it granted Gentry's two motions for summary judgment and dismissed Gaines's fourth and final claim after a bench trial. As such, the orders of the Fayette Circuit Court are AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Michael D. Meuser
Elizabeth C. Woodford
Lexington, Kentucky

BRIEF FOR APPELLEE:

John H. Dwyer, Jr.
Louisville, Kentucky